Affirmed by published opinion. Judge LUTTIG wrote the opinion for the court. Judge WILLIAMS wrote an opinion concurring in part and concurring in the judgment in part. Judge GREGORY wrote an opinion concurring in part and dissenting in part.
OPINION
LUTTIG, Circuit Judge.
Bradley Nigh sued Koons Buick Pontiac GMC, Inc. (Koons Buick) for claims under the Truth In Lending Act (TILA), the Federal Odometer Act (FOA), and the Virginia Consumer Protection Act (VCPA), along with numerous claims sounding in contract, fraud, and conversion, all in connection with his purchase from Koons Buick of a used 1997 Chevrolet Blazer. Koons Buick filed a counterclaim for-breach of contract and fraudulent and negligent misrepresentation. At summary judgment, the district court granted judgment on several claims and all the counterclaims. Some of Nigh’s TILA, FOA, and VCPA claims survived for a jury trial and resulted in a verdict finding Koons Buick liable for $24,192.80 under TILA, and for $4,000.00 under the VCPA. Koons Buick appeals from the jury’s verdict, as well as from several of the court’s orders. Nigh, in a cross-appeal, also challenges several of the court’s orders. Finding no error in the verdict or the court’s rulings, we affirm the judgment below.
*122 I.
This case arose from Koons Buick’s sale of a truck to Bradley Nigh. The sale was not a simple cash-for-product exchange, but involved a somewhat tortured effort by Koons Buick to provide Nigh consumer financing. Nigh first went to Koons Buick on February 4, 2000. While there, he decided to trade in his prior vehicle and buy the Blazer. To complete the sale, he executed a Buyer’s Order, reflecting the proposed purchase, and a “Retail Installment Sales Contract” (RISC I), reflecting the proposed financing. The Buyer’s Order and RISC I both reflected that Nigh would pay $4,000 down, and trade in his prior vehicle. Nigh received no price reduction for his trade-in because he estimated its remaining loan balance to equal the price Koons Buick gave him for it, but he also agreed to pay off any excess balance over the estimate. Nigh, having signed the contracts and turned them over to Koons Buick, was committed to the transaction and obliged to perform upon counter-signature by Koons Buick. Koons Buick did not counter-sign the documents as Nigh signed them, but intended to sign only once a lender agreed to buy an assignment of the installment payments owed under RISC I. The transaction’s closing and the completion of Nigh’s purchase were thus left within the dealership’s unilateral control.
Nigh left the dealership in the Blazer, on the authority of a temporary certificate of ownership issued under Va.Code § 46.2-1542. Nigh left his trade-in vehicle behind, in anticipation that a lender would purchase assignment of the payments owed under RISC I and the transaction would close. Koons Buick, however, was unable to find a willing lender. Consequently, it restructured the deal to require an additional $2,000 down payment. The dealership represented this change to Nigh as a “better deal” at a lower rate, necessitating a new RISC (RISC II). Nigh returned to the dealership on February 25 based on this representation, but told Koons Buick he did not have an additional $2,000. He asked to return the new truck, retrieve his trade-in vehicle, and walk away from the deal. Koons Buick, however, told him he could not withdraw because it had sold his trade-in. Nigh, unaware of this statement’s falsity, and at a loss, signed RISC II and a $2,000 Promissory Note to cover the added down payment.
Koons Buick, again unable to find a willing lender, called Nigh back. . Nigh alleged the dealership told him, via a message left with his brother, that he had to come back to sign a new RISC (RISC III) or it would report the Blazer as stolen. Afraid of arrest, Nigh returned to the dealership on March 5, and under protest, signed RISC III with a back-date of February 25. Koons Buick later closed the transaction by executing the contract documents and selling assignment of RISC Ill’s installment payments to Household Automotive Finance Corporation (HAFC).
Afterwards, Nigh learned that his trade-in vehicle had been repossessed from the Koons Buick lot by its note-holder because Nigh, believing the vehicle to have earlier become property of Koons Buick, failed to make required payments. Nigh also learned that one of the reasons Koons Buick had been unable to get a lender to accept RISC II was that it contained an unaccounted for charge, later determined to be for a product whose sale to Nigh had not been properly documented, which Nigh did not recall seeing on the transaction documents, and which he never requested, agreed to accept, or received. The product, a Silencer car alarm, was listed on the second Buyer’s Order and on RISC II at a price of $965. But absent from the trans *123 action documents was a Silencer “we owe” form, which is used in retail car sales to document the sale of “after market” products in financed transactions. Disgruntled by the whole affair, Nigh made no payments on the truck and returned it to Koons Buick with a letter asserting a right to rescission. HAFC repossessed the truck from the dealership’s lot because Nigh made no payments.
Nigh, claiming that Koons Buick defrauded him, brought this action under the statutory authority of TILA, FOA, and the VCPA, and under the common law. Koons Buick counterclaimed for breach of contract. The district court granted summary judgment to Koons Buick on its counterclaims and on many of Nigh’s claims, but preserved for trial limited claims under TILA, FOA, and the VCPA. At trial, Nigh prevailed on his TILA claim that Koons Buick intentionally included the charge for the Silencer on RISC II without a basis for the charge, and on his VCPA claim that Koons Buick violated the VCPA by telling him that he did not have valid possession of the Blazer in order to induce him to sign RISC III. The court issued a Supplemented and Final Judgment on August 15, 2001, three months after trial, to clarify its summary judgment ruling on Koons Buick’s counterclaims. This order is the proceeding’s final judgment, from which appeal is now had.
II.
As a preliminary jurisdictional matter, Nigh contends that Koons Buick did not timely file a notice of appeal. His objection was already addressed by a motions panel of this court, and denied for lack of merit. The district court filed a Supplemented and Final Judgment on August 15, 2001, and it is against this date that the notice of appeal’s timeliness must be measured, irrespective of the fact that the court had earlier filed a Final Judgment and had set a subsequent date at which point notice of appeals tolling would end. Assessed in light of the August 15, 2001, order, Koons Buick’s notice was timely.
III.
The parties raise a variety of claims on appeal, none of which merit reversing the district court’s conclusions of law or the fact-finder’s determinations, but which we address in turn, beginning first with Koons Buick’s claims.
A.
Koons Buick attacks the district court’s denial of summary judgment on Nigh’s claim that RISC II constituted a TILA violation on several grounds. First, Koons Buick argues that because RISC II was never counter-signed, it is an unfunded financing agreement and cannot form the basis for TILA liability. Under what is commonly known as Regulation Z, creditors operating under 15 U.S.C. § 1638(b)(1), which governs this transaction, must “make [TILA] disclosures before consummation of the transaction,” 12 C.F.R. § 226.17(b) (emphasis added); cf. 15 U.S.C. § 1638(b)(1) (“disclosures ... shall be made before the credit is extended” (emphasis added)). TILA liability, however, cannot accrue until a credit transaction is consummated, or put another way, “until credit is in fact extended,” Baxter v. Sparks Oldsmobile, Inc., 579 F.2d 863 (4th Cir.1978) (holding that a signed buyer’s order that contemplated an installment sales contract did not constitute an extension of credit and so no TILA violation occurred), since until credit is extended to a person in a particular transaction there are no credit terms against which to assess a disclosure’s accuracy. The pertinent legal question then is what *124 consummation of a credit transaction, or extension of credit, encompasses.
Regulation Z defines consummation as the “time that a consumer becomes contractually obligated on a credit transaction.” 12 C.F.R. § 226.2 (emphasis added). Under this regulation, a number of courts have held that consummation, or extension of credit, can encompass unfunded financing agreements. See, e.g., Johnson v. Steven Sims Subaru, Inc., 1993 WL 761231 (N.D.Ill.1993); Bryson v. Bank of New York, 584 F.Supp. 1306 (S.D.N.Y.1984); Madewell v. Marietta Dodge, Inc., 506 F.Supp. 286 (N.D.Ga.1980); Copley v. Rona Enterprises, Inc., 423 F.Supp. 979 (S.D.Ohio 1976); see also Dryden v. Lou Budke’s Arrow Finance Co., 630 F.2d 641 (8th Cir.1980) (holding that an unenforceable transaction was an extension of credit). We agree with this rule because the regulation expressly refers solely to the consumer’s commitment and because TILA’s express purpose of protecting consumers from receiving inadequate disclosures prior to their entering into credit transactions could not otherwise be effectuated. If consummation, or extension of credit, does ,not encompass a consumer’s commitment to a financing agreement that provides unilateral power for the creditor to execute the agreement later, creditors could intentionally provide faulty disclosures to consumers, obtain their commitment, and then afterwards provide accurate disclosures prior to closing the transaction, which if provided earlier might have dissuaded the consumer from accepting the credit, all without incurring TILA liability. As the Bryson court noted:
[T]he point at which the consumer ... commits himself or herself to the purchase of credit, without regard for the degree of commitment of the lender ... [is the point at which] the consumer becomes vulnerable to actual damage from the lender’s inadequate or deceptive disclosures, for at this time he or she can be contractually bound to the terms of the lending contract at the option of the lender.
Bryson, 584 F.Supp. at 1317 (emphasis added). Consequently, we conclude that consummation, or extension of credit, under § 1638 encompasses unfunded, financing agreement options to which consumers contractually commit, and under which they can be bound at the lender’s sole discretion. Here, Nigh’s signing of RISC II and his giving over of the signed documents to Koons Buick worked his commitment and constituted consummation, or an extension of credit. Thus, the district court properly concluded that liability attached “when Nigh made the choice and committed himself to the purchase of credit,” Nigh v. Koons Buick Pontiac GMC, Inc., 143 F.Supp.2d 535, 549 (E.D.Va.2001).
Koons Buick next attacks its TILA liability by arguing that, since the second Buyer’s Order Nigh signed has a line-item listing the Silencer product for a price of $965, RISC II’s disclosures were accurate, and thus do not violate TILA. But, for several reasons this claim also fails. First, the dealership conceded from the outset of this action that the $965 charge was a mistake and thus, by necessary implication, that RISC II was inaccurate. See Field Affidavit, J.A. at 252 (owner and president of Koons Buick admitting that “[p]laintiff should not have been charged for a silencer” and explaining that as a result “a third [RISC] was prepared”); see also Defendant’s Responses to Plaintiffs First Set of Requests for Admissions, J.A. at 817 (“Admit that a charge of $965.00 was included on the second Buyer’s Order for a “silencer.” Admitted that the charge was included in error.” (emphasis added)). Indeed, it was on the basis of these admissions that Koons Buick *125 argued on summary judgment that it was due judgment under the affirmative defense of 15 U.S.C. § 1640(c), a bona fide error defense available to creditors who show that their TILA error was not intentional, but was a good faith mistake.[1] Koons Buick also argued on these admissions of error that if § 1640(c) did not apply, then § 1640(b) did, which provides an affirmative defense for lenders who have timely made corrections to their TILA errors.[2] Having conceded by affidavit, admission, and legal argument that the Silencer line-item was in error, Koons Buick cannot now contend that it was not in error and thus that RISC II was accurate.
Second, Koons Buick waived the legal argument that the congruence between the Buyer’s Order and RISC II proves that RISC II accurately disclosed the transaction by virtue of the fact that it makes the argument for the first time here in the Court of Appeals. Though Koons Buick asserts in its briefs that it raised this legal objection earlier in the proceedings, its assertion is unsupported by the record. The citation to which Koons Buick directs the court records its argument at the start of trial, and after the summary judgment proceedings were concluded. See J.A. at 317-20. And though that trial exchange contains Koons Buick’s assertion that RISC II accurately disclosed the transaction by virtue of its congruence with the second Buyer’s Order, it noted this objection only in furtherance of its argument that the error in RISC II was an innocent error:
When a mistake was discovered in the buyer’s order agreement, there was a new retail installment contract which changed the APR and lowered the APR. That’s the kind of mathematical error, assuming this was a TILA violation to start with that the correction of errors was designed to address.
So, to the extent to which it’s a TILA violation — and I’m not quite even [sure] it’s a TILA violation because the first— [RISC II] was accurate as to the deal that both parties mistakenly agreed to. And certainly, Mr. Nigh having signed it, is not in a position to later come back and say he was unfairly taken advantage of.

So, your Honor, we believe that in ruling that we’re not entitled to the [§ 16JfO(b) ] defense for correction of errors, that the Court is incorrect.

(J.A. at 318-20).
Lastly, but equally fatal to Koons Buick’s argument is the fact that the jury, after being properly instructed on the law, rejected Koons Buick’s claim that the Buyer’s Order provided a basis for RISC II’s Silencer charge. We do not speculate as to the substance of a jury’s factual determination, and only inquire whether sufficient evidence supported the verdict.
The verdict form read as follows:
Do you find that Koons violated the Truth in Lending Act by intentionally, including a charge for a “Silencer” on the Retail Installment Sales Contract signed on February 25, 2000 with knowledge that there was no basis for the charge?
(J.A. at 763) (emphasis added). The jury answered “Yes.” Id. Having evaluated the exhibits and the testimony, the jury decided that the apparent congruity between *126 the Buyer’s Order and RISC II did not constitute a basis for RISC II’s Silencer line-item. The jury’s conclusion that there was no basis, from the Buyer’s Order or any other document, for RISC II’s Silencer line-item could well have been based on a determination that some portion of the transaction documents were unreliable, a determination supported by the record’s disclosure that Nigh executed no “we owe” form for the Silencer and that HAFC noticed this unusual absence, see J.A. at 769, and by Mr. Nigh’s testimony that he never noticed a charge for the Silencer when he signed the second Buyer’s Order and RISC II, see J.A. at 479-82. The jury’s finding of liability was sufficiently supported by this evidence.
Koons Buick’s last challenge to the TILA judgment involves the court’s application of the statutory damages cap that 15 U.S.C. § 1640(a)(2)(A) establishes for TILA liability. Koons Buick contends that the court erred in allowing statutory damages of twice the finance charge in connection with the transaction, citing Mars v. Spartanburg Chrysler Plymouth, 713 F.2d 65 (4th Cir.1983) (summarily interpreting § 1640(a)(2)(A) to cap TILA statutory damages in all individual actions at $1,000). Koons Buick’s reliance on Mars is misplaced.
In 1983, when Mars was decided, the act read as follows:
(a) ... any [TILA violator] is liable to such person in an amount equal to the sum of—
(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000[.]
§ 1640(a)(2)(A) (1980) (emphasis added). In 1995, however, Congress amended the act to read as follows:
(a) ... any [TILA violator] is liable to such person in an amount equal to the sum of—
(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000, or (in) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2,0001]
§ 1640(a)(2)(A) (1995) (emphasis added).
The Mars decision plausibly interpreted the phrase “under this subparagraph” to apply to the whole of subparagraph (A) in 1983. But the 1995 amendment, by striking the “or” preceding (ii), and inserting (in) after the “under this subparagraph” phrase, rendered Mars’ interpretation defunct. Whereas in 1983 it was plausible to interpret the maximum and minimum provision as coming at the end of subpara-graph (A), and not exclusively within sub-paragraph (ii), the new provision clearly places that clause wholly within (ii). Of even greater importance, the provision now expressly sets a statutory maximum and minimum in subparagraph (iii) that is different from that provided in the pre *127 existing maximum and minimum clause. The inclusion of the new maximum and minimum in (iii) shows that the clause previously interpreted to apply to all of (A), can no longer apply to (A), but must now apply solely to (ii), so as not to render meaningless the maximum and minimum articulated in (iii). As a consequence of the 1995 amendment, the damages that may be awarded under subparagraph (i) are now simply “twice the amount of any finance charge in connection with the transaction,” and the court’s instruction that if Koons Buick violated TILA Nigh was “entitled to twice the [entire] finance charge” was proper.
Judge Gregory’s disagreement with this analysis is founded on the mistaken conclusion that we must conclude that Congress abrogated Mars in order to reach our decision here. See post at 131. Of course, when a statute has been amended we interpret the new statute, not the old, and any prior opinion interpreting the old statute is necessarily brought before us for review so that we may ascertain whether the logic of that prior interpretation still applies to the new statutory language. Our responsibility is thus not to determine whether there is evidence that “Congress intended to override the Fourth Circuit’s” precedent (or any circuit precedent for that matter), as Judge Gregory believes. See post at 131. The questions before this court, and that which we address above, are simply whether Congress amended the statute in a way relevant to the prior interpretation, and if it did, what does the amended statute mean.
Furthermore, though Judge Gregory thinks our analysis necessarily implies that Congress “changed the meaning of the word ‘subparagraph,’ ” see post at 132, it does no such thing. As explained above, Congress’ amendment requires that the reference point of the “under this subpara-graph” clause be the subparagraph of § 1640(a)(2)(A)(ii), and not the subpara-graph of § 1640(a)(2)(A). Indeed, it is Judge Gregory who would have this court change the meaning of the term “subpara-graph,” as his analysis would ignore the plain reading of that term and instead conclude that it was either meant in the plural, thus referencing subparagraphs (i) and (ii), or that it was a term of art not referencing a distinct subparagraph at all.
Judge Gregory’s conclusion that our reading of the “under this subparagraph” clause creates surplusage in the statute’s construction and “inconsistency” among its parts is equally flawed. See post at 132. Indeed, if the “under this subparagraph” clause had been omitted from the amended statute, Judge Gregory would have a much better case for his interpretation. Had that occurred, he could argue that Congress intended the maximum and minimum codified in (ii) to apply to both (i) and (ii), using a comma preceding the maximum and minimum to set it off from (ii) and to show its applicability to (i) and (ii), and not using language that requires identifying a distinct subparagraph to which to apply the maximum and minimum. Thus, rather than being surplusage, the inclusion of the “under this subparagraph” clause not only enables, but actually compels, the reading we give the statute by applying the maximum and minimum limits to a distinct subparagraph.
Nor does the clause create “inconsistency” among the statute’s parts either. Just because Congress did not use the same terminology to restrict the maximum and minimum in (iii) to that subparagraph as it did to restrict the maximum and minimum in (ii) to that subparagraph, it does not follow that “Congress must have meant the statutory caps ... to have different applications,” see post at 132. That fact leads only to the conclusion that the plain *128 language of each must be interpreted individually to ascertain its meaning.
It could well be, as Judge Gregory concludes, that Congress did not intend to alter the statutory cap applicable under subparagraph (A)(i) when it amended the statute in 1995. However, the critical point of law — and it is critical — is that we do not know what Congress intended; all that we have before us is the amended statute from which to determine intent. And, based upon that statute, the far better, and indeed compelled, interpretation is that Congress did alter the statutory cap regardless of its intent. It is the statute, not any inferential intent, that constitutes the law. Of course, it goes without saying, if Congress enacted into law something different from what it intended, then it can simply amend the statute to bring the statute in line with congressional intent. In this way, and in this way only, are the constitutional roles of the legislature and the courts respected.
Koons Buick’s last substantive attack on the district court’s rulings involves the grant of summary judgment on its counterclaims. The dealership argues that the court erred by reversing, post-trial, its pre-trial grant of summary judgment with respect to installment payments owed by Nigh under RISC III. But the court did not err in this regard, because it did not reverse itself. As the court made clear, the Supplemented and Final Judgment, filed after trial, did not change the court’s pre-trial holding; it simply “clarifie[d]” it (J.A. at 894). Admittedly, in granting summary judgment on the counterclaims, the court held that Nigh breached his contractual obligations in three ways: 1) failing to pay off the excess loan balance on his trade-in, which exceeded his estimate; 2) failing to pay on the $2,000 Promissory Note; and 3) failing to make installment payments. But the court calculated damages to Koons Buick only for the first two. It found Koons Buick entitled to $1,959.73 for the excess pay-off amount, and $2,000.00 for the Promissory Note. The court never said Koons Buick was entitled to the installment payments Nigh failed to make to HAFC; it never calculated damages to Koons Buick from this breach; and it never concluded that Koons Buick was entitled to any award for it.
Koons Buick, meanwhile, asserts it is entitled to the $30,000 due under RISC III since the court found that Nigh breached his installment payment obligations, even though it sold those rights to HAFC and HAFC repossessed the Blazer upon Nigh’s breach. The dealership argues it is entitled to damages for the breach because it was the assignor of the sales contract. See Carozza v. Boxley, 203 F. 673, 677 (4th Cir.1913) (noting that either an assignor or an assignee can sue on a defaulted contract). It further argues that even if it may not recover under Carozza, it may recover on HAFC’s rights in order to preclude its own liability under Va.Code § 8.01-13, which allows assignees to recover against assignors of defaulted writings.
Both contentions fail. Koons Buick’s counterclaim pleading nowhere refers to either installment payments or its status as an assignor. See Koons Buick’s Answer and Counterclaim (J.A. at 63). Thus, Koons Buick did not put Nigh or the court on notice that it was suing on the installment payments, or under any assignment based theory, as would have been required for it to recover on the breach. See Fed. R.Civ.P. 8; Labram v. Havel, 43 F.3d 918, 920 (4th Cir.1995) (a “pleaded claim [must] afford the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved”) (citations omitted). Though the court found that Nigh breach *129 ed his RISC III payment obligations, it made no award on this basis to Koons Buick, and Koons Buick, having failed to plead on this basis, was due no award. The Supplemented and Final Judgment properly clarified this point.
Koons Buick also appeals the VCPA judgment. That judgment, however, was supported by properly admitted evidence and was sufficient to establish that Koons Buick made material misrepresentations to Nigh. These misrepresentations were intended to deceive, did deceive, and caused loss; and the jury’s verdict may not be set aside. Koons Buick lastly challenges the district court’s rulings on both parties’ motions for costs and attorney fees. Its objections are without merit; the court did not abuse its discretion in reaching cost and fee determinations.
B.
Nigh contends on his cross-appeal that the district court erred in granting summary judgment to Koons Buick on two claims. First, he argues that the court should have allowed him to proceed to trial on his TILA claims involving RISC III. Nigh submits that since RISC III, though signed on March 5, was back-dated to February 25, it resulted in interest being accrued as of February 25, and thus necessitated that TILA disclosures also be given as of that date. Since Nigh did not receive the disclosure documents for RISC III until March 5, he reasons that Koons Buick violated TILA and did not deserve summary judgment on the claim. Nigh’s argument, though superficially clever, is without merit. While he was liable for monies calculated from February 25 on, he did not become liable for, those monies until March 5, by which point he had received the material disclosures. As Nigh himself points out, “TILA required Koons to provide Nigh with [the] disclosures ... prior to the consummation of the transaction,” Appellee’s Br. at 44, and “the parties did not sign [RISC III] until March 5, 2000,” id. at 46.[3]
Nigh also argues that the court erred by rejecting his claim to be entitled to rescission under Va.Code § 46.2-1542 as a result of Koons Buick’s allegedly untimely transfer of title. Though Nigh was given a temporary ownership certificate governed by § 46.2-1542 upon signing RISC I, Nigh and Koons Buick executed a reassignment of title within thirty days, validly transferring title before the statutory deadline and depriving Nigh of a claim to rescission. See J.A. at 778 (DMV records establishing that the title transfer date for the Blazer was February 25, 2000).

CONCLUSION

The judgment of the district court is affirmed.

AFFIRMED.

. The jury ultimately rejected this defense, finding that Koons Buick "intentionally in-clud[ed]” the Silencer charge.

. The district court correctly rejected this defense because Koons Buick never notified Nigh of the error.

. Because Nigh only argued on appeal that the back-dating of RISC III caused its accompanying disclosures to be untimely, we do not properly have before us the related question, addressed by the district court in Rucker v. Sheehy Alexandria, Inc., 228 F.Supp.2d 711 (E.D.Va.2002), of whether such back-dating might affect the accuracy of the accompanying disclosures.