PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

TIMOTHY GIBSON,

*Plaintiff-Appellee,*

v.

LTD, INCORPORATED,

*Defendant-Appellant.*

No. 04-2110

TIMOTHY GIBSON,

*Plaintiff-Appellant,*

v.

LTD, INCORPORATED,

*Defendant-Appellee.*

No. 04-2131

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-03-1374-1)

Argued: September 19, 2005

Decided: January 11, 2006

Before NIEMEYER and LUTTIG, Circuit Judges,
and Robert J. CONRAD, Jr., United States District Judge for the
Western District of North Carolina, sitting by designation.

---

Affirmed in part, reversed in part, vacated in part, and remanded in
part by published opinion. Judge Niemeyer wrote the opinion, in
which Judge Luttig and Judge Conrad joined.

---

**COUNSEL**

**ARGUED:** Yama Anthony Shansab, WALTON & ADAMS, P.C., Reston, Virginia, for Appellant/Cross-Appellee LTD, Incorporated. Alexander Hugo Blankingship, III, BLANKINGSHIP & ASSO-CIATES, P.C., Alexandria, Virginia, for Appellee/Cross-Appellant Timothy Gibson. **ON BRIEF:** Robert V. W. Adams, III, WALTON & ADAMS, P.C., Reston, Virginia, for Appellant/Cross-Appellee LTD, Incorporated. Thomas B. Christiano, BLANKINGSHIP & ASSOCIATES, P.C., Alexandria, Virginia, for Appellee/Cross-Appellant Timothy Gibson.

**OPINION**

NIEMEYER, Circuit Judge:

In order to obtain financing for the purchases of a 2002 Dodge truck and a 2003 Dodge truck from Lustine Toyota/Dodge, Inc., in Woodbridge, Virginia, Timothy Gibson executed a total of five retail installment sales contracts — two in connection with the 2002 purchase and three in connection with the 2003 purchase. After Gibson wrecked his 2002 truck and returned the 2003 truck upon Lustine's demand when Lustine learned that Gibson was no longer employed, Gibson commenced this action challenging the legality of disclosures made in the retail installment sales contracts. He alleged violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and related Virginia law.

The district court held that disclosures in the first 2002 contract and the first 2003 contract constituted violations of TILA and awarded Gibson statutory damages, as well as $53,627.50 for statutorily authorized attorneys fees. The court rejected Gibson's claim that Lustine improperly disclosed a charge for the inclusion of "GAP insurance"[1] as part of the amount financed in the second 2003 contract.

---

[1]When a vehicle is totaled, "GAP insurance" ("Guaranteed Auto Protection" insurance) pays off the consumer's outstanding loan balance if the reimbursement by the consumer's property damage insurance carrier is insufficient.

For the reasons that follow, we affirm the district court's findings that two contracts violated TILA and reverse its rejection of Gibson's claim that the GAP insurance cost was improperly disclosed as part of the amount financed on the second 2003 contract. We also vacate the district court's award of attorneys fees to permit the court to reassess its award in light of Gibson's additional meritorious claim.

I

Timothy Gibson, a young welder from Texas who did not complete high school and who had little credit history, came to Virginia in 2002 with his older brother to work for a contractor in Dumfries, Virginia. After having had to hitch rides with his brother and to take taxicabs for transportation, Gibson decided to purchase a truck from Lustine Toyota/Dodge ("Lustine") on October 31, 2002. After selecting a new 2002 Dodge Dakota truck, a Lustine employee who sells aftermarket products asked Gibson whether he was interested in purchasing undercoating, paint sealant, fabric protector, floor mats, or other aftermarket products. According to Gibson, he told the sales representative that he did not want any such products — a fact that Lustine has not disputed. The sales representative nonetheless saved in her file an "After Sale Invoice," not signed by Gibson, showing a $499 charge for undercoating and paint sealant. Later that day, Gibson signed a buyer's order for the truck and a retail installment sales contract to finance it that committed him to pay $21,201.39, after applying his down payment. This sum included a $499 charge for "AFTER MRKT," but no such charge was disclosed on the retail installment sales contract. The charge was included in the gross amount financed.

In his buyer's order, Gibson agreed to permit Lustine to follow its practice of selling his retail installment sales contract to a third party. Moreover, the buyer's order provided:

> If Purchaser is financing this transaction, it is conditioned upon approval of Purchaser's proposed retail installment sale contract as submitted to or through the Dealer. If that proposed retail installment sale contract is not approved

under the terms agreed to with the Dealer, Purchaser may cancel this invoice . . . .**²**

In a financing addendum to the retail installment sales contract, Gibson also agreed that he was accepting delivery of the truck that day "pending approval by a financing source" and that if Lustine did not receive approval from a financing source, Lustine could rescind the transaction. Lustine remained bound, however, until it gave notice that it was rescinding the contract by its failure to sell the loan. As to Gibson, the retail installment sales contract provided that he remained bound after he signed the contract and that he could "only cancel it if the seller agree[d] or for legal cause." Gibson took delivery of the truck on October 31, 2002, the same day he entered the dealership and signed the retail installment sales contract.

Lustine was unable to find a third-party finance company to purchase Gibson's retail installment sales contract because of Gibson's low credit rating. Accordingly, Lustine had Gibson return to the dealership on November 11, 2002, to restructure the deal and execute a new retail installment sales contract that reduced the amount financed to $17,114.17. This was accomplished by deleting the $499 "AFTER MRKT" charge, deleting a $500 GAP insurance charge, and increasing Gibson's down payment. As restructured, this second retail installment sales contract was sold to Triad Financial Corporation.

In early 2003, Gibson crashed his truck into a pole, totaling it. On February 5, 2003, he returned to Lustine to purchase a replacement truck. He chose a new 2003 Dodge Dakota truck and again signed a buyer's order as well as a retail installment sales contract to finance $22,889.36, after applying his down payment. This amount included a $500 charge for GAP insurance and an overcharge in the amount

---

**²**In the 2003 form of Retail Installment Sales Contract that Lustine used, the wording of this provision was changed slightly, to provide:

> If Purchaser is financing this transaction or leasing the vehicle, the transaction is conditioned upon approval of Purchaser's retail installment sale contract or lease by a financial source on terms acceptable to the Dealer. If the retail installment sale contract or lease is not approved, Purchaser or Dealer may cancel this sale . . . .

of $12.39 resulting from Lustine's miscalculation of the dealer's business license tax. The inclusion of the GAP charge on the buyer's order and on the retail installment sales contract was authorized by an addendum that Gibson signed, agreeing to purchase the GAP insurance. Gibson took delivery of the 2003 truck that day.

Again, Lustine was unable to sell this 2003 retail installment sales contract to a finance company. One finance company, however, agreed to purchase the loan if it were restructured to provide for an amount financed no greater than $21,900. Accordingly, Gibson returned to the dealership on February 12, 2003, and signed a second retail installment sales contract that provided for financing the amount of $21,248.70. Under this restructured arrangement, Gibson increased his down payment and thereby decreased the amount financed. This second 2003 contract again included a $500 charge for GAP insurance, even though Gibson did not again sign an addendum to authorize the charge as he had a week earlier for the first 2003 contract.

A couple of days after Gibson signed the second 2003 retail installment sales contract — on February 14, 2003 — Lustine was advised that Gibson still owed Triad Financial money on the loan for his 2002 truck because the insurance payout on the totaled vehicle was less than the amount of the outstanding loan. Because Gibson did not have GAP insurance, Lustine proposed to cover Gibson's deficiency by absorbing part of it and passing on the remainder to Gibson as an increase in the price of the 2003 truck. Gibson returned to the dealership on February 18 to sign a third retail installment sales contract agreeing to this arrangement.

After Gibson signed the February 18 retail installment sales contract, Lustine learned that Gibson had quit his job on February 6, 2003, the day after he signed his credit application for financing the 2003 truck. Because of Gibson's unemployment, Lustine told Gibson that he had to return the vehicle, and Gibson did so.

After returning the 2003 truck, Gibson commenced this action against Lustine, alleging multiple violations of TILA, a violation of the Virginia Consumer Protection Act, and common law fraud. On cross motions for summary judgment, the district court ruled in favor of Lustine in all of Gibson's claims except two: The court ruled in

Gibson's favor finding (1) that the $499 charge for "AFTER MRKT" on the first retail installment sales contract was improperly included in the amount financed inasmuch as it was "undisputed" that Gibson did not order, nor did he receive, aftermarket products and (2) that the first 2003 retail installment sales contract included an overcharge of $12.39 for the dealer's business license tax. In making these findings, the district court rejected Lustine's principal argument that, because neither of the retail installment sales contracts on which violations were found had been purchased by third-party finance companies and no monies were ever loaned on them, the contracts were not "consummated" as required by federal law. The court relied on our decision in *Nigh v. Koons Buick Pontiac GMC, Inc.*, 319 F.3d 119 (4th Cir. 2003), *rev'd in part* 125 S. Ct. 460 (2004), to reject Lustine's argument. The parties agreed that *Nigh* dictated an award of $63,847.94, twice the sum of the two finance charges related to Gibson's successful claims.[3] And because Gibson was a successful plaintiff under the TILA, Gibson submitted a claim for attorneys fees in the amount of $82,957.50, pursuant to 15 U.S.C. § 1640(a)(3). The district court awarded Gibson $53,627.50.

From the district court's judgment, Lustine appeals, challenging the court's conclusion that the relevant retail installment sales contracts were "consummated" and its holding that Gibson was improperly charged $499 for aftermarket products on the first 2002 contract. Gibson filed a cross-appeal challenging the district court's rejection of his claim that the second 2003 retail installment sales contract improperly included a charge for GAP insurance in the amount financed.

II

Lustine's overarching contention is that neither of the violations found by the district court are actionable because they arose from retail installment sales contracts that were not "consummated." The claim for the improper disclosure of the $499 aftermarket charge arose from the first 2002 retail installment sales contract, which was rejected by third-party lenders and replaced by a second one; and the

---

[3]Gibson has stipulated that because the Supreme Court has since reversed the judgment in *Nigh*, these statutory damages should now be reduced to $2,000, $1,000 for each violation.

claim based on the $12.39 overcharge related to the first 2003 retail installment sales contract, which was superseded by a second contract entered into a week later. Because neither of the two contracts was purchased by a third-party finance company and credit was never extended to Gibson on either of them, Lustine argues that any violation with respect to them cannot lead to sanctions imposed by TILA, which regulates only "consummated" credit contracts. *See* 15 U.S.C. § 1638(b)(1); 12 C.F.R. § 226.17(b).

Recognizing that our holding in *Nigh* might be applied to hold that the transactions in this case were indeed consummated, Lustine argues that *Nigh* is "inapposite" because it "analyzed neither the [Federal Reserve Board's] Official Commentary nor state law." *Appellant's Br.* at 24. Lustine asserts that Federal Reserve Board's Commentary "expressly interprets consummation under Regulation Z to impose a state law construct." *Id.* at 19-20 (discussing ¶ 2(a)(13)-1 of the Official Staff Commentary to 12 C.F.R. Pt. 226, Supp. I ("Official Staff Commentary"), which provides: "*State law governs.* When a contractual obligation on the consumer's part is created is a matter to be determined under applicable law; Regulation Z does not make this determination"). Lustine contends that under Virginia law, a condition precedent must be fulfilled before the "contract shall take effect," *Smith v. McGregor*, 376 S.E.2d 60, 65 (Va. 1989), and reasons that a contract that does not take effect until a condition precedent is fulfilled is one that is not "consummated." *Appellant's Br.* at 22, 24 ("There was no consummation, and hence no TILA liability").

The Truth in Lending Act was enacted to inform consumers' use of credit by increasing their awareness of credit costs. *See* 15 U.S.C. § 1601(a). Consequently, the Act requires "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." *Id.* To this end, TILA requires the disclosure of, among other things, the "amount financed" and the "finance charge." *See id.* § 1638(a) & (b). The "amount financed" is defined to be the "amount of credit of which the consumer has actual use," *id.* § 1638(a)(2)(A), and the "finance charge" is defined as all charges "imposed directly or indirectly by the creditor as an incident to the extension of credit." The finance charge "does not include charges of a type payable in a comparable cash transaction." *Id.* § 1605(a).

These and the other required disclosures must be made "before the credit is extended." 15 U.S.C. § 1638(b)(1). Regulation Z, the Federal Reserve Board's primary TILA regulation, elaborates on this timing requirement, providing that a creditor must "make disclosures before *consummation* of the transaction." 12 C.F.R. § 226.17(b) (emphasis added). "Consummation" in turn is defined to occur at the "time that *a consumer* becomes *contractually obligated* on a credit transaction." *Id.* § 226.2 (emphases added). This definition of "consummation," adopted in 1982, moved away from the pre-1982 definition which provided that a "transaction shall be considered consummated at the time *a contractual relationship is created between a creditor and a customer* . . . irrespective of the time of performance of either party." *Id.* § 226.2 (kk) (January 1, 1981 version) (emphasis added). As one district court noted soon after the 1982 change, "[u]nder the new, revised definition . . . courts should only look at the point in time that the consumer becomes contractually obligated on the credit transaction." *Zoumayaiwan v. Jack Haggerty Olds, Inc.*, 1985 WL 1453 (N.D. Ill. 1985); *see also* 46 Fed. Reg. 20848, 20851 (Apr. 7, 1981) ("As before, state law determines when the contractual obligation arises, but the revised definition focuses on when the consumer becomes obligated").

In *Nigh*, we construed Regulation Z, concluding that because the regulation "expressly refers *solely* to the consumer's commitment" and because of "TILA's express purpose of protecting consumers from receiving inadequate disclosures prior to *their* entering into credit transactions," "consummation . . . encompasses unfunded, financing agreement options to which consumers contractually commit, and under which they can be bound at the lender's sole discretion." *Nigh*, 319 F.3d at 124. We reasoned that consummation occurs when a consumer has done all he can to be committed to the terms of a credit transaction, for

> [i]f consummation, or extension of credit, does not encompass a consumer's commitment to a financing agreement that provides unilateral power for the creditor to execute the agreement later, creditors could intentionally provide faulty disclosures to consumers, obtain their commitment, and then afterwards provide accurate disclosures prior to closing the transaction, which if provided earlier might have dissuaded

the consumer from accepting the credit, all without incurring TILA liability.

*Id.* Thus, we concluded that a consumer "consummates" an unfunded retail installment sales contract when *he* signs it even if the dealer has not signed it. *Id.* at 123.

In view of the language of the Act, as well as Regulation Z, we find unpersuasive Lustine's assertion that *Nigh* is inapposite. The change to Regulation Z in 1982 altered the definition of consummation from when a "contractual relationship is *created*" to when the "*consumer* becomes *contractually obligated* on a credit transaction." It is this distinction on which *Nigh* focused — determining not when a contract becomes effective under state law, but when the *consumer* becomes "contractually obligated." *See Nigh*, 319 F.3d at 122 ("Nigh, having signed the contracts and turned them over to Koons Buick, was committed to the transaction and obliged to perform upon countersignature by Koons Buick"). The amended Regulation Z focuses only on the consumer and his obligations. Accordingly, the question in this case is not whether a contract was created under state law, as urged by Lustine, because such an analysis would revert to the old Regulation Z. Instead, the question is whether Gibson was obligated to the terms of credit in the retail installment sales contracts upon which he bases his TILA claims.

Applying *Nigh*, we conclude that when the purchaser of a motor vehicle signs a retail installment sales contract after which he no longer can alter the terms of credit and after which the dealer retains the exclusive right to decide when the financing arrangement takes effect, the transaction is "consummated" for TILA purposes. *See Nigh*, 319 F.3d at 124; *see also* Official Staff Commentary ¶ 2(a)(13)-2 ("Consummation does not occur when the consumer becomes contractually committed to a *sale* transaction, unless the consumer also becomes legally obligated to accept a particular credit arrangement") (emphasis in original). We specifically held in *Nigh* that, when the consumer had signed a buyer's order and a retail installment sales contract, the transaction was "consummated." After signing the contract, the consumer could no longer change the financing terms even though the dealer had not yet signed the contract. If these unsigned documents in *Nigh* were sufficient to justify the conclusion that the

consumer was contractually obligated for purposes of TILA, then, *a fortiori*, a document signed by both parties that would be a contract but for an unfulfilled condition that a third-party finance company purchase the loan *on terms acceptable to dealer* likewise contractually obligated the consumer for TILA purposes. Thus, we need not decide whether, under Virginia law, these contracts contained valid conditions precedent so long as Lustine, not Gibson, had control over satisfaction of them.

The Eleventh Circuit has applied the *Nigh* construction of "consummation" to that very circumstance where the condition precedent was controlled by the dealer. *See Bragg v. Bill Heard Chevrolet, Inc.*, 374 F.3d 1060, 1066 (11th Cir. 2004) (adopting *Nigh* and agreeing that "consummation occurred not when title to the automobile passed or when a bilateral contract was formed, but rather when [the purchaser] signed the [retail installment sales contract], thereby becoming obligated on the credit agreement"). The contract in *Bragg* stated that "neither party hereto shall be bound to the other until terms of the credit have been approved by both parties." *Id.* at 1067. The court rejected the dealer's argument that because the transaction was *conditioned* on securing third-party financing, the agreements were not consummated until they were funded, observing that the condition precedent was within the dealer's own control. The court explained that to allow such a condition to prevent "consummation" would frustrate TILA's primary purposes. *See id.* at 1067-68. Based on our reading of Regulation Z, we find *Bragg* persuasive.

With the controlling legal principles in hand, we now turn to the circumstances before us to determine specifically whether the two retail installment sales contracts in question — the first 2002 contract and first 2003 contract — were "consummated."

Both Gibson and Lustine signed the two retail installment sales contracts in question, and after each contract was signed, Gibson took delivery of the truck he purchased. More importantly, after signing each contract, Gibson could no longer alter the terms of the credit. The first paragraph in each contract stated that "by signing this contract you choose to buy the vehicle on credit under the agreements on the front and back of this contract." Each contract also stated that "[a]fter *you sign this contract*, you may only cancel it if the seller

agrees or for legal cause. You cannot cancel this contract simply because you change your mind." (Emphasis added). The contracts did not give Gibson any power to approve third-party proposals for purchasing his loan, as the contract in *Bragg* arguably did. Instead, the contracts in this case vested in Lustine alone the power to fulfill the purported condition precedent by securing outside financing, "on terms acceptable to [Lustine]." Thus, after Gibson signed the retail installment sales contract in each case, he became contractually obligated to the credit transaction and could be released from it only with Lustine's approval. In these circumstances, we conclude that the contracts were "consummated" in the sense used by TILA when Gibson signed them. *See* 12 C.F.R. § 226.2; *Nigh*, 319 F.3d at 124; *Bragg*, 374 F.3d at 1066; *Zoumayaiwan*, 1985 WL 1453.

Lustine makes much of the mutual power to revoke the sales transaction if financing could not be found and of Gibson's state-created right to terminate a delivery if financing could not be found. Even if we assume the existence of these conditional revocation powers, they do not prevent "consummation," for consummation is postponed only when the consumer has not yet become contractually obligated to the terms of credit. The fact remains that if Lustine had found an "acceptable" lender, Gibson could not have exercised either power to revoke the terms of credit. He would have been required to proceed with the purchase on the loan terms contained in the retail installment sales contract that he signed.

Accordingly, we agree with the district court that Gibson "consummated" the retail installment sales contracts at issue in this case and therefore could claim specific TILA violations with respect to each of them.

## III

Lustine does not challenge the district court's conclusion that the $12.39 overcharge for the dealer's business licensing tax in the first 2003 retail installment sales contract constituted a violation of TILA. Its only argument with respect to that charge is that the retail installment sales contract was not consummated, an argument that we have now rejected. Accordingly, we affirm the district court's ruling on that contract. *See* 12 C.F.R. § 226.18(c)(1)(iii). Regulation 226.18(c)

requires a creditor to itemize charges, like taxes, that are "paid to other persons by the creditor on the consumer's behalf." If the creditor intends to overcharge and retain a portion of such a sum, it may do so provided that such a retention is disclosed. *See* Official Staff Commentary, ¶ 18(c)(1)(iii)-2. In this case, no such disclosure was made.

IV

Finally, Lustine contends that it properly included a $499 charge for undercoating and paint sealant in the amount financed by the first 2002 retail installment sales contract. Lustine notes that its file contained an "After Sale Invoice" for $499 for undercoating and paint sealant, signed by Lustine but not Gibson, and that the buyer's order, which Gibson *did* sign, includes a charge in the amount of $499 for "AFTER MRKT," which was a component part of the "balance due on delivery" in the amount of $21,201.39. The retail installment sales contract signed at the same time congruently states that the "amount financed" is $21,201.39. Thus, by signing these documents, according to Lustine, Gibson agreed to charges for undercoating and paint sealant later to be applied by the dealer.

Gibson contends that it is undisputed that he explicitly refused Lustine's offer to purchase undercoating and paint sealant; that he never received those products; and that he was never promised them by Lustine. He argues therefore that he never had "actual use" of the products and any charge for them was illegal under TILA, citing 15 U.S.C. § 1638(a)(2)(A) and *Nigh*, 319 F.2d at 124.

The district court concluded as a matter of law that the undisputed facts in the record showed that Gibson did not order aftermarket products; that they were not included on his truck when he took delivery of it; and that they were never promised to Gibson. The court also concluded that despite these facts, the $499 charge was included in the amount financed by the first 2002 retail installment sales contract that Gibson signed. The district court rejected any suggestion that the presence of the "After Sale Invoice" in Lustine's file created a genuine factual dispute on this issue. The court explained that Lustine's sales representative was "unable to either confirm or contradict" Gibson's sworn testimony that he declined the offer for undercoating and

paint sealant, and therefore the reason for the "After Sale Invoice" in Lustine's file could only be deduced by "conjecture and surmise." Moreover, the invoice itself was not signed and did not include a date for the installation of undercoating and paint sealant, as was called for on the invoice form.

Lustine does not disagree with the facts on which the district court relied. Rather, it argues that "Gibson, who signed the [buyer's order and the retail installment sales contract], is presumed to know and assent to their terms," citing *Sydnor v. Conseco Financial Services Corp.*, 252 F.3d 302, 306 (4th Cir. 2001), and *General Insurance of Roanoke, Inc. v. Page*, 464 S.E.2d 343, 344 (Va. 1995). Their terms explicitly included a $499 charge for "AFTER MRKT," which Lustine argues is an agreement to purchase undercoating and paint sealant for $499.

Lustine's response is flawed at two levels. First, Lustine cannot demonstrate that Gibson knew or should have known that the $499 charge on the buyer's order was for undercoating and paint sealant. The record contains no evidence that (1) Gibson accepted the offer for undercoating and paint sealant; (2) that Gibson signed anything other than the buyer's order which could have referred to undercoating and paint sealant; and (3) that Gibson received any document evidencing Lustine's obligation to apply undercoating and paint sealant at some future date. Indeed, as to this last fact, Lustine's practice was to give the consumer a "we owe" memorandum that would have disclosed its obligation to install undercoating and paint sealant at some future date. This "we owe" memorandum was not prepared with respect to Gibson's transaction. Thus, Lustine is left with the single notation on the buyer's order — "AFTER MRKT - $499.00" — from which to argue that Gibson should be imputed with an agreement to purchase undercoating and paint sealant.

Although Lustine might be able to argue reasonably that "AFTER MRKT" refers to aftermarket products as distinguished from some other aftermarket charge, service, or expense, it reaches too far to claim that a casual consumer would understand what an aftermarket product is when that term has not been defined for the consumer by the dealer. Absent such an explanation, "AFTER MRKT" is virtually meaningless, particularly when it is part of a list of unexplained

charges or credits that also includes "dealer's business license tax," "Virginia title tax," "processing fee for consumer services," "license fee," and "dealer incentive." Without more evidence of an understanding by Gibson, the mere entry on an invoice of "AFTER MRKT" does not amount to a disclosure sufficient to support the claim that Gibson agreed to pay for undercoating and paint sealant.

Second — and more important to the legal analysis — Lustine has not established that even if Gibson is to be imputed with an understanding of the term "AFTER MRKT," he ever had "actual use" of undercoating and sealant for which the charge could be included in the amount financed. *See* 15 U.S.C. § 1638(a)(2)(A) (specifying that the amount financed "shall be the amount of credit of which the consumer has *actual use*" (emphasis added)). While the fact that undercoating and paint sealant had not been applied to Gibson's truck when he took delivery of it and was never applied during the months that followed might not be fatal if Lustine had clearly obligated itself to apply undercoating and paint sealant at a date to be arranged, the record does not contain any evidence of such an obligation. To the contrary, the dealer's practice at the time was to sign and deliver a "we owe" memorandum committing the dealer to apply aftermarket products. Yet, no "we owe" memorandum was signed or delivered to Gibson. Moreover, as observed by the district court, the unsigned "After Sale Invoice" that Lustine had in its own file did not have Gibson's signature nor a date for which the proposed products would be installed, as called for on the "After Sale Invoice" form. Thus, it can hardly be argued that when Gibson did not receive undercoating and paint sealant at the time of sale and was not promised them at the time of sale for installation at some future date, he nonetheless had "*actual use*" of the products so that a charge for them could legally be included in the amount financed.

TILA § 1638 defines "amount financed" as "the amount of credit of which the consumer *has actual use*." 15 U.S.C. § 1638(a)(2)(A) (emphasis added). If a lender has no basis for including a charge for undercoating and paint sealant as part of the purchaser's amount financed, the disclosure of the "amount financed" is erroneous, and the error gives rise to TILA liability. We therefore affirm the district court on this claim.

## V

In his cross-appeal, Gibson contends that Lustine's inclusion of a GAP insurance charge in the amount financed on his second 2003 retail installment sales contract violated TILA because he did not authorize the charge. Without his authorization, he contends, Lustine could only include the charge as part of the finance charges, not as part of the amount to be financed, as Lustine did.

Lustine argues that the written instrument that Gibson signed, authorizing a GAP insurance charge in connection with his first 2003 retail installment sales contract, continued to apply and that the dealership did not again have to obtain that authorization when the parties modified the deal only a week later. Lustine maintains that Virginia law supports its position, which would treat the two transactions a week apart as sufficiently contemporaneous to be a single transaction. Lustine also points to Federal Reserve Board Commentary, which provides that "[i]f the parties informally agree to a modification of the legal obligation, the modification should not be reflected in the disclosures unless it rises to the level of a change in the terms of the legal obligation." *See* Official Staff Commentary, ¶ 17(c)(1)-2.

TILA, however, does not permit the inclusion of charges such as a GAP insurance charge in the "amount financed" — as distinct from a "finance charge" — unless the consumer explicitly agrees to such a charge in writing. Regulation Z, 12 C.F.R. § 226.4(d)(3)(i), provides that "[c]harges or premiums paid for debt cancellation coverage . . . may be excluded from the finance charge, whether or not the coverage is insurance," if three conditions are fulfilled: (1) the lender discloses in writing that debt cancellation coverage is not required; (2) the lender discloses the fee for the initial term of coverage; and (3) the consumer signs or initials an "affirmative written request for coverage after receiving" these two disclosures.

While Gibson signed an authorization that satisfied this regulation before signing the first 2003 retail installment sales contract, it is undisputed that he did not sign such an authorization before signing the second 2003 retail installment sales contract a week later. Under Regulation Z, the disclosure would not have to be repeated if the second 2003 retail installment sales contract modified the first and if the

modification did not rise "to the level of *a change in the terms of the legal obligation.*" We conclude, however, that the modifications in the second 2003 retail installment sales contract materially changed Gibson's legal obligations. Under the second contract, Gibson increased the down payment for the truck and thereby reduced the amount financed. With this change, all of the material figures in the contract changed, including most importantly, the amount of the finance charge. Gibson thus became legally obligated to pay wholly new amounts. In short, the second 2003 retail installment sales contract consummated a new finance arrangement, and Regulation Z requires that the lender make new disclosures before its consummation. *See* 12 C.F.R. § 226.17.

Because the second 2003 retail installment sales contract was not accompanied by the disclosures required by 12 C.F.R. § 226.4(d)(3)(i), Lustine was not entitled to include the GAP insurance charge as part of the amount financed, as it did. Rather, it could only include that charge as a component of the finance charge. Because this violation occurred with respect to the second 2003 retail installment sales contract, we reverse the district court on this claim and remand for imposition of the appropriate sanction.

Lustine's appeal to Virginia law is of no moment on this issue because federal law, not Virginia law, governs the determination of this aspect of TILA liability.

VI

TILA entitles the plaintiff in "any successful action" enforcing TILA liability to costs and a "reasonable attorney's fee as determined by the court." 15 U.S.C. § 1640(a)(3). Because Gibson has been successful on three TILA claims, not just the two found by the district court, we vacate the district court's award of attorneys fees and remand to permit the court to reassess its award in view of these changed circumstances.

The parties have briefed the issue whether the district court's attorneys fees award should stand in light of the Supreme Court's reversal of *Nigh*, which constitutes an intervening change in the decisional law reducing Gibson's maximum recovery from $63,848 to $2,000 (now

perhaps $3,000). Lustine argues that the attorneys fees award in the amount of $53,627.50 is no longer proportional in light of Gibson's reduced recovery.

Because we have vacated the attorneys fees award, we will not address this issue, giving the parties an opportunity to address their arguments in the first instance to the district court. Moreover, we express no opinion on whether the district court should modify its attorneys fees award.

*AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED IN PART*