**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 01-2134**

─────────────

ARTHUR TRIPP, on behalf of themselves and others similarly situated; MELDREDTH TRIPP, on behalf of themselves and others similarly situated,

        Plaintiffs - Appellants,

    and

CHRISTIE SHEPHERD; TIMOTHY SHEPHERD,

        Plaintiffs,

    v.

CHARLIE FALK'S AUTO WHOLESALE INCORPORATED; FUTURE FINANCE CORPORATION,

        Defendants - Appellees,

    and

CHARLIE FALK, SR.; FRED HAILEY; KATHERINE FALK,

        Defendants.

───────────────────────────

FINOVA CAPITAL CORPORATION,

        Movant.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, Chief District Judge. (CA-00-512-3)

---

Argued: May 13, 2008                    Decided: August 29, 2008

---

Before TRAXLER and GREGORY, Circuit Judges, and Alexander WILLIAMS, Jr., United States District Judge for the District of Maryland, sitting by designation.

---

Affirmed by unpublished opinion. Judge Williams wrote the opinion, in which Judge Gregory joined. Judge Traxler wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Thomas Dean Domonoske, LAW OFFICE OF DALE W. PITTMAN, Harrisonburg, Virginia, for Appellants. Robert Dean Perrow, WILLIAMS MULLEN, Richmond, Virginia, for Appellees. **ON BRIEF:** John Cole Gayle, Jr., KANE, JEFFRIES, GAYLE, MCGRATH & COOPER, Richmond, Virginia; Dale W. Pittman, Petersburg, Virginia; David Brian Rubinstein, Fredericksburg, Virginia, for Appellants. J. P. McGuire Boyd, Jr., WILLIAMS MULLEN, Richmond, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

WILLIAMS, District Judge:

This appeal involves the interpretation of two federal statutes: the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., and the Motor Vehicle Information and Cost Savings Act (the "Federal Odometer Act" or "FOA"), 49 U.S.C. § 32701, et seq. Appellants Arthur and Linda Tripp (the "Tripps") appeal the district court's denial of their motion for summary judgment and the granting of Charlie Falk Auto Wholesale, Inc.'s ("CFAW") motion for summary judgment on both of the Tripps' claims arising under TILA and the Federal Odometer Act. Because the Tripps have failed to show that there are genuine issues of material fact that CFAW violated either TILA or the Federal Odometer Act, we affirm the district court's ruling.

I.

On August 7, 1999, the Tripps entered into a deal at CFAW for the purchase of a 1994 Ford Taurus (the "vehicle"), which they intended to finance. After the Tripps had selected the vehicle and negotiated the basic terms of the deal, a CFAW employee placed several documents (the "transaction documents") before them to read and sign. The primary transaction documents were as follows: the Buyer's Order; the Motor Vehicle Installment Sale Contract, which included the Truth-in-Lending Disclosures, the Promissory Note, and the Security Agreement (the "credit contract"); the Re-Assignment

3

of Title by Virginia Motor Vehicle Dealer Form (the "Re-Assignment Form"); a document entitled "Important Notice;" and the Application for Certificate of Title and Registration.

The Buyer's Order itemized the sale price of the vehicle and other amounts to be paid. It also contained an odometer disclosure statement, showing that the vehicle had a total mileage of 67,154 miles. This document included a provision entitled "Seller's Right to Cancel," which essentially provided that if the financing deal had not been accepted by the financing company -- Future Finance Company, Inc. ("Future Finance") -- the Seller could void the contract. This clause provided for the return of the vehicle and allowed the Buyer to receive his down payment, less any mileage charges or physical damage or other expenses incurred in recovering the vehicle.

The Credit Contract is the document setting forth the terms and conditions of the financing deal in addition to the required TILA disclosures. This document also contained a provision regarding the contingency of the contract on the approval of the financing agreement by Future Finance. The Credit Contract, like the Buyer's Order, included a section entitled "Itemization of Amounts Owed," which reflected the inclusion of a $395.00 processing fee in the total amount financed.

The Important Notice document contains an exact reprint of a provision from the sales contract, notifying the buyer and co-buyer

4

that the vehicle must be returned to the dealer if the financing agreement is not approved. The document also included a provision at the top of the page that the buyer is to read the notice carefully and sign below, "acknowledging complete understanding" of the contract and its terms.

The Re-Assignment Form is a document that transferred title to the vehicle from CFAW to the Tripps and also identified Future Finance as the lienholder on the vehicle. Additionally, this document contained the odometer disclosure statement, which also showed a mileage reading of 67,154 on the date of purchase, August 7, 1999.

Finally, the Application for Certificate of Title and Registration disclosed the owner's information, the lienholder's information, as well as the mileage disclosure and the date of purchase.[1]

A CFAW employee presented and explained these documents to the Tripps, and afterwards, the Tripps signed each document, thereby completing the transaction and contractually binding themselves. The deal required the Tripps to make a $1,000 down payment, $500 of which was initially paid the Tripps, with the remaining balance being paid in two installments within the next

---

[1]In addition to these documents, CFAW issued a temporary certificate for the vehicle and gave temporary license tags to the Tripps.

two weeks.  That same day, the Tripps left the dealership with the vehicle.

On August 24, 1999, CFAW informed the Tripps that Future Finance had not approved the deal.  CFAW then gave the Tripps the option to restructure a new deal, which would require an additional $500 down payment, or they could return the vehicle.  The Tripps did not agree to either of these options, and CFAW subsequently took possession of the vehicle.  Thereafter, on August 25, 1999, Mr. Tripp went to CFAW and requested the return of his down payment.  He was told that he could receive a refund that day only if he went to the Norfolk dealership.  Thereafter, the Tripps went to Norfolk, Virginia, to receive their refund.  They were asked again by a CFAW employee to renegotiate the deal but refused.  Before the Tripps could receive their refund, they were required to sign a Release Form, which purported to release CFAW from any liability and prevent the Tripps from bringing any suit or claim against CFAW regarding the purchase of the vehicle.  After deducting the contractual mileage charge, the Tripps received a check in the amount of $656.80 and cashed it that day.

On August 8, 2000, the Tripps initiated this lawsuit by filing their complaint in the Eastern District of Virginia.[2]  Both parties

---

[2]The case was initially filed as a class action against CFAW, Future Finance – its related financial institution – and CFAW's chief individual officers for violations of both federal and state law.  However, the individual defendants, as well as the other set of Plaintiffs, were dismissed from the case.

filed motions for summary judgment: the Tripps moved for summary judgment on the TILA and the Virginia Consumer Protection Act claims, and CFAW moved for summary judgment on the TILA and the Federal Odometer Act claims. After hearing oral argument, the district court found that the Release signed by the Tripps was unenforceable and not supported by adequate consideration, and thus not a valid contract. The district court then ruled on the federal law claims, denying the Tripps' motion for summary judgment and granting CFAW's motion for summary judgment. The district court also declined to exercise supplemental jurisdiction over the state law claims and accordingly dismissed those claims.[3]

## II.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a grant of summary judgment, we apply the same

---

[3]There has been quite a delay in the completion of this appeal. The Tripps filed their Notice of Appeal on September 19, 2001. However, on February 7, 2002, after the Tripps filed their opening brief but before CFAW (and Future Finance) filed their response brief, the case was suspended pending the resolution of a Chapter 11 bankruptcy petition filed by Future Finance. See In re Future Finance Company, Inc., Case No. 02-DHA-70457 in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division. Since that cased has been resolved, the briefing scheduled was resumed by Order of the Court, dated November 14, 2007.

standards as the district court, and our scope of review is de novo. Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, (1986). The Tripps appeal the district court's ruling granting summary judgment to CFAW on the TILA and the Federal Odometer Act claims as well as its decision to decline jurisdiction over the state law claims. We shall address each claim individually.

III.

Under TILA, the Tripps contend that the district court erred in granting summary judgment to CFAW because material issues of fact remain as to whether CFAW complied with TILA by providing the required credit disclosures to the Tripps in the proper form and at the proper time, as mandated by the Act and its regulations. First, they argue that CFAW failed to comply with the form and timing provision of the Act's disclosure requirements by waiting until after the contract was signed to give the Tripps a copy of the document. Second, they argue that CFAW failed to label the processing fee as a "finance charge" that was optional for cash purchasers. Third, the Tripps argue that CFAW failed to make known

8

that the TILA disclosures were estimates.  Finally, as a result of these violations, the Tripps contend that they are entitled to statutory damages.

A.

TILA was passed by Congress in order to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." 15 U.S.C. § 1601(a); see also Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356, 363 and n.20 (1973).  TILA mandates that creditors make specific disclosures before extending credit to consumers. 15 U.S.C. § 1638(a), (b).  The Federal Reserve Board ("FRB"), the agency charged with administering the statute, has adopted Regulation Z to implement the Act's mandates and methods of disclosure. See 12 C.F.R. Part 226 (2001).

TILA requires a lender to disclose to a borrower, among other things, the amount financed, the finance charge, the annual percentage rate, and the total sale price. 15 U.S.C. § 1638; 12 C.F.R. § 226.18.  In closed-end transactions, like the one in this case, the creditor must make the specified disclosures "clearly and conspicuously in writing, in a form that the consumer may keep" before "consummation[4] of the transaction," i.e., before the credit

---

[4] "Consummation" means the time that a consumer becomes contractually obligated on a credit transaction. 12 C.F.R. § 226.2(a)(13).

9

is extended. 12 C.F.R. § 226.17(a), (b); see also 15 U.S.C. § 1638(b).  The Amended Commentary to the regulation states that

> Creditors are not required to give the consumer two separate copies of the document before consummation, one for the consumer to keep and a second copy for the consumer to execute.  The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated.  It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated.  The consumer must be free to take possession of and review the document in its entirety before signing.

67 Fed. Reg. 16983 (April 9, 2002) (emphasis added).[5]

We have had the opportunity to address the plain meaning of this regulation in Polk v. Crown Auto, Inc., 221 F.3d 691 (4th Cir. 2000) (Polk I).  There, the issue before the court was "whether a seller is required to make the required disclosures in writing and in a form that the consumer can keep before consummation, or whether Regulation Z is satisfied as long as the disclosures are

---

[5]Regulation Z also provides the following illustration showing a creditor's compliance with the form and timing requirements of 12 C.F.R. § 226.17:

> A creditor gives a consumer a multiple-copy form containing a credit agreement and TILA disclosures.  The consumer reviews and signs the form and returns it to the creditor, who separates the copies and gives one copy to the consumer to keep.  The creditor has satisfied the disclosure requirement.

67 Fed. Reg. at 16983.

10

made in some form [i.e., orally] before consummation and the consumer later receives the disclosures in writing, in a form that he can keep." Polk I, 221 F.3d at 692. We held there that the plain meaning of the statute was clear, in that written disclosures must be provided to the consumer in a form that he could keep before consummation of the transaction. Id.

Turning to the facts in this case, the Tripps contend that CFAW violated TILA because they did not provide the Tripps with the document containing the TILA disclosures in a form they could keep prior to consummation, i.e., they were not given physical possession of the document as opposed to simply viewing it. However, contrary to the Tripps' interpretation, nothing in the statute or the case law requires actual, physical possession of the documents to satisfy the Act's provisions. As long as disclosures are made in writing before the transaction is complete, the requirements under the statute and the regulations are met.

Here, the record shows that a CFAW employee provided the transaction documents and credit disclosures to the Tripps before signing, i.e., before the transaction was consummated, and the Tripps had the opportunity to read the documents before signing. This manner of presenting the documents satisfied the form and timing requirements. Polk I, 221 F.3d at 692; see Regulation Z, 67 Fed. Reg. at 16983 ("The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted

11

credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated.").

TILA does not compel the consumer to take the document, although they are not prevented from doing so. Nor does TILA compel the consumer to read it, although it is perhaps a prudent thing to do. The Tripps admitted several times that they did not read the contract or all of the documents placed before them. The Tripps also acknowledged during their deposition testimony that CAFW gave them the transaction documents and explained "most of the important numbers." (J.A. 276). Furthermore, the Tripps stated that the CFAW employee asked them to sign the document "if all of that [the terms] was agreeable to [them]." (J.A. 276). Their signature is evidence that the disclosed credit terms were "agreeable" to them.

Additionally, one of the stated purposes of TILA is to allow consumers to use these disclosures and "compare more readily the various credit terms," presumably with other creditors. The Tripps admitted in their depositions that they were not going to "shop around" to other dealerships because they were told that they were approved for a car, and there was no reason to continue searching. (J.A. 259-60). While that fact does not relieve CFAW of its obligations to comply with the statute, it diminishes the likelihood of a violation, and it certainly minimizes any potential

12

harm or damage, if any, to the Tripps by CFAW's actions. Nevertheless, the record shows that CFAW did provide the Tripps the disclosures in writing in a form they could keep prior to consummation. Thus, we find that there were no violations of the form and timing requirements as provided under TILA.

B.

The Tripps next contend that CFAW violated TILA by failing to label the $395 processing fee as a "finance charge" that was optional for cash purchasers. As stated above, the "finance charge" is one of the items that must be disclosed to consumers. 15 U.S.C. § 1638(a)(3); see also 12 C.F.R. § 226.18 (requiring disclosure and itemization of, inter alia, the finance charge and the amount financed). Under TILA, a "finance charge" is any charge "imposed directly or indirectly by the creditor as an incident to the extension of credit," but it "does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a); see also 12 C.F.R. § 226.4(a). The reason is that such charges cannot be considered as having been imposed "as an incident to the extension of credit." To prevail under this provision of TILA, a plaintiff must provide evidence that a fee was incident to the extension of credit and not charged in comparable cash transactions. See Polk v. Crown Auto, Inc., 228 F.3d 541, 542 (4th Cir. 2000) (Polk II); see also Alston v. Crown Auto, Inc., 224 F.3d 332, 334 (4th Cir. 2000).

13

The Tripps argue that they presented evidence that an issue of fact was raised about whether CFAW charged them a mandatory processing fee that was optional for cash purchasers. They point to the deposition testimony of Mr. Timothy Doe, who testified on behalf of CFAW for a previous case in 1999 where CFAW was involved. Mr. Doe testified during a deposition in that case that the processing fee would not have been charged to a customer who purchased a vehicle with cash. (J.A. 178-79, 664-65). Mr. Doe later corrected himself, after having taken a break and reviewed the relevant documents, and came back on the record to explain that he had been mistaken on one of his previous answers and that the $395 processing was charged on all transactions – both cash and credit. (J.A. 666-67).

In this case, Mr. Doe testified that regardless of whether the transaction is one for cash or credit, the $395 processing fee is charged to all customers for the necessary title work. (J.A. 629-633). In addition, documents produced by CFAW show that in 1999, when the Tripps purchased their vehicle, CFAW's general practice was to charge the fee to both cash and credit customers.[6] Moreover, these documents – the Buyer's Purchase Orders – clearly indicate that the seller's processing fee is "applicable to Cash or

---

[6]CFAW produced eighteen Buyer's Purchase Orders showing that between July 1999 and September 1999 – the relevant time period for the Tripps' transaction – the $395.00 processing had been charged in cash sale transactions. (J.A. 414-431).

14

Credit Sales." (J.A. 414-31). Because the Tripps have not produced evidence to refute CFAW's general practice of charging the $395 processing for both cash and credit transactions, we find that the $395 processing fee was not a "finance charge" under TILA, and CFAW was not required to disclose it as a "finance charge." Polk II, 228 F.3d at 542 (4th Cir. 2000) (finding that $85 processing fee was not a "finance charge" under TILA and that dealer was not required to disclose it as such); Alston, 224 F.3d at 334 (same).

C.

The Tripps next argue that CFAW violated TILA by failing to make known that the disclosures were estimates. They underscore their argument by contending that the district court erred in failing to determine whether the contract was one with a condition precedent or a condition subsequent so as to establish the effective date of the contract and thus determine whether the disclosures were accurate at that time.

TILA requires that the credit disclosures "reflect the terms of the legal obligation of the parties." 12 C.F.R. § 226.17(c)(1). Disclosures must be labeled as estimates when "any information necessary for an accurate disclosure is unknown to the creditor." 12 C.F.R. § 226.17(c)(2)(I). Moreover, even If the information disclosed under TILA is "subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the

15

delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation." 15 U.S.C. § 1634.

For purposes of TILA, the crux of the inquiry begins and ends at the moment when the transaction is consummated. As we have held previously, when the consumer has signed the buyer's order and the retail installment sales contract, the transaction is "consummated." Nigh v. Koons Buick Pontiac GMC, Inc., 319 F.3d 119, 124 (4th Cir. 2003), rev'd on other grounds, 543 U.S. 50, 125 S.Ct. 460 (2004). Relying on Nigh, we concluded in Gibson v. LTD, Inc., that "when the purchaser of a motor vehicle signs a retail installment sales contract after which he no longer can alter the terms of credit and after which the dealer retains the exclusive right to decide when the financing arrangement takes effect, the transaction is 'consummated' for TILA purposes." 434 F.3d 275, 281 (4th Cir. 2006); Nigh, 319 F.3d at 124; see also Bragg v. Bill Heard Chevrolet, Inc., 374 F.3d 1060, 1066 (11th Cir. 2004) (adopting Nigh as being consistent with Regulation Z and the consumer's obligations for unfunded financing agreements).

Here, when the Tripps signed the contract documents on August 7, 1999, the transaction was consummated, thereby contractually obligating the Tripps to the terms of the deal. If the credit contract had been approved at a later time, the effective date of the contract would relate back to the date of consummation – August 7, 1999. The credit contract stated, in addition to the Important

16

Notice, that the contract was "contingent on Future Finance Company, Inc. or other assignee approving and purchasing the contract from seller." (J.A. 357). It goes on to explain that "in the event the contract is not purchased from seller for whatever reason, the contract shall be voidable at the sole option of the seller." Id. If the financing company had approved and agreed to purchase the credit contract, then the Tripps would have been legally obligated to purchase the vehicle at the terms disclosed on the credit contract; those terms could not be altered by the Tripps. If the financing company had not approved the contract, then the contract was voidable, since there would (most likely) be no contract. As such, the terms disclosed under the credit contract need not have been disclosed by CFAW as estimates – those were the amounts disclosed to the Tripps that they were obligated to under the contract.

The Seventh Circuit case of Janikowsky v. Lynch Ford, Inc., 210 F.3d 765 (7th Cir. 2000), is also instructive on this point. There, the court affirmed the entry of summary judgment to the dealer where the plaintiff entered into a new contract to buy a vehicle at an 11.9% interest rate, when the dealer could not obtain financing at the initial contract rate of 5.9%. Id. at 767. The court rejected Plaintiff's argument that the 5.9% interest rate was an estimate, stating that it was not an estimate but rather, the contractual rate, and thus, an "accurate disclosure for that

17

contract" since it "could not and did not vary under its terms." Id. at 768. The court went on to explain that had the financing condition been satisfied, the plaintiff would have been obligated to purchase the vehicle at the 5.9% interest rate. Id. The plaintiff could have canceled the contract and refused to purchase the vehicle, but "[e]ither way, the disclosed rate was a set rate, not an estimate." Id.

Moreover, contrary to the Tripps argument, the determination of whether the contract was one with a condition precedent or a condition subsequent is unnecessary. Consummation has still occurred with the signing of the unfunded credit contract by the Tripps. The sales contract states that the sale is "not contingent upon financing on terms that are satisfactory to Buyer, yet [is] contingent upon acceptance of this contract by Future Finance Company or other Assignee." (J.A. 355). As we have stated before, as long as the dealer, and not the consumer, had control over satisfaction of the terms, we need not reach the issue of condition-precedent or condition-subsequent. See Gibson, 434 F.3d at 282.

D.

Next, the Tripps contend that they are entitled to statutory damages for CFAW's violations under TILA's form and timing requirements and that fact issues remain as to whether CFAW provided the Tripps with the substantive disclosures in a form they

18

could keep before consummation.  We disagree.  Since we have found that there were no violations of the form and timing requirements or of the manner in which the disclosures were given to the Tripps, we find that the Tripps are not entitled to any damages under TILA. As a result, the district court properly granted summary judgment to CFAW on the TILA claims.

IV.

Under the Federal Odometer Act ("FOA"), the Tripps argue that the district court erred in granting summary judgment to CFAW because material issues of fact remained regarding whether CFAW violated the Act, particularly regarding whether the "intent to defraud" element was present.

FOA requires that persons transferring ownership of a motor vehicle must disclose to the transferee, in writing, the "cumulative mileage registered on the odometer." 49 U.S.C. § 32705(a)(1)(A).  The purpose behind the act was to "prohibit tampering with motor vehicle odometers" and "to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701(b).  However, it is important to note that FOA's disclosure provisions are not implicated until ownership of the vehicle is transferred. 49 U.S.C. § 32705(a)(1); see also 49 C.F.R. § 580.5[C].  FOA defines "transfer" to mean "to

19

change ownership by sale, gift, or any other means." 49 U.S.C. § 32702(8).

FOA prohibits the transferor from making false statements to the transferee surrounding the required mileage disclosures. 49 U.S.C. § 32705(a)(2). We have interpreted this prohibition to mean that FOA is violated when the mileage specified on the disclosure statement fails to correspond with the vehicle's actual number of miles traveled, even if the stated mileage does correspond to the odometer reading at the time of sale. Ryan v. Edwards, 592 F.2d 756, 760 (4th Cir. 1979).[7] Civil liability arises under FOA only if a person violating the Act did so with "intent to defraud." 49 U.S.C. § 32710; Ryan, 592 F.2d at 761.

At the outset, we note that Virginia is considered a "strict title" state, which means that transfer of ownership of a motor vehicle requires the assignment of title. Allstate Ins. Co. v. Atlanta Cas. Co., 260 Va. 148, 155, 530 S.E.2d 161, 165 (2000); Rawl's Auto Auction v. Dick Herman Ford, Inc., 690 F.2d 422, 426-27 (4th Cir. 1982) (citing Thomas v. Mullins, 153 Va. 383, 149 S.E. 494 (1929)). FOA allows title to be transferred on a Reassignment of Title Form as long as the mileage and other required disclosures are provided on that document. 49 C.F.R. § 580.5(b),[c].

---

[7]In Ryan v. Edwards, we interpreted 15 U.S.C. § 1988, the predecessor to the current Federal Odometer Act, which also required "[d]isclosure of the cumulative mileage registered on the odometer" and prohibited false statements in the disclosure. 595 F.2d 756 (4th Cir. 1979).

20

Before proceeding to the substance of FOA, we must first determine whether the FOA's requirements are triggered – whether title (i.e., ownership) was transferred to the Tripps. Reviewing the facts of this case, we find that ownership of the vehicle did not transfer to the Tripps, and, thus, did not trigger the requirements of FOA. First, the Tripps admit that title to the vehicle was never transferred to them. In their complaint, they state that CFAW never "signed title of the car over to the Tripps." (J.A. 19, 24). Additionally, in Virginia, ownership is transferred whenever title has been assigned to the transferee. Allstate Ins. Co., 260 Va. at 155, 530 S.E. 2d at 165. Here, since the credit contract was not approved by Future Finance and the contract was voided by CFAW, title was never assigned to the Tripps. The Tripps merely had possession of the vehicle between the time they signed the credit contract and the time the vehicle was returned to CFAW. As it remains, there is no viable claim under FOA.

To the extent that title somehow did transfer to the Tripps, we find that the disclosure requirements of FOA had been satisfied. CFAW, in accordance with the regulations, was entitled to use a valid Re-Assignment of Title document (that would have eventually transferred title to the Tripps) since title to the vehicle was not in CFAW's name. 49 C.F.R. § 580.5©. Title was actually in the name

21

of Crestar, with a reassignment to CFAW. (J.A. 47, 787).[8] As shown from the Crestar title, CFAW obtained a written assignment of title on July 24, 1999, from Crestar, and no new title was issued in CFAW's name. On August 7, 1999, when the Tripps signed the credit contract and were given possession of the vehicle, title of the vehicle remained in Crestar's name.

On July 24, 1999, Crestar disclosed the mileage of the vehicle as 67,149 miles, when it assigned the vehicle's title to CFAW. (J.A. 47, 787). Two weeks later, on August 7, 1999, CFAW disclosed the mileage to the Tripps on the Re-Assignment form as 67,154 miles (J.A. 778, 358). This reading was taken after a short test drive by the Tripps. (J.A. 728, 393). On the Re-Assignment of Title form, CFAW properly disclosed the mileage at the time the form was executed. In addition to the odometer reading at the time of transfer, the form also had the other disclosures as required under the regulation: the date of transfer, the transferor's name and current address; the transferee's name and current address; and the identity of the vehicle, including the make, model, year, and body type; and its vehicle identification number. See 49 C.F.R. 580.5©. Moreover, no evidence has been produced by the Tripps to refute these odometer readings as inaccurate.

---

[8]Virginia law allows a dealer to obtain a reassignment of title from a transferor, and since the dealer, like CFAW, merely holds a vehicle for resale, it is not required to register the title with the Virginia department of motor vehicles. See Va. Code Ann. § 46.2-631 (West 2008).

Finding that there were no violations of FOA, we need not reach the issue of CFAW's alleged "intent to defraud." Furthermore, the law was envisioned to protect consumers from unscrupulous dealers who were intentionally trying to conceal a vehicle's mileage and take advantage of unsuspecting buyers who were relying upon those disclosures in assessing the safety and reliability of a vehicle. The facts and circumstances of this case do not present that situation. Here, CFAW properly recorded the mileage of the vehicle from the title to the re-assignment form, and the various documents and testimony do not present any material issues of fact as being in dispute with regard to the mileage disclosure. As such, the district court properly granted summary judgment to CFAW under FOA.

V.

Finally, the Tripps argue that the district court erred in dismissing their remaining state law claims. The district court, having disposed of the Tripps' federal claims under TILA and FOA, declined to exercise its supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367©. A district court has the inherent power to dismiss a case having only state law claims provided that the conditions for declining supplemental jurisdiction under 15 U.S.C. § 1367© have been met. <u>Hinson v. Norwest Fin. S. C., Inc.</u>, 239 F.3d 611, 617 (4th Cir. 2001). Here, the district court

23

declined to hear the remaining state law claims since the federal claims over which it had original jurisdiction had been dropped from the case through summary judgment. See 28 U.S.C. § 1367(c)(3). These remaining claims could not provide a basis for original jurisdiction under federal question, 28 U.S.C. § 1331.[9] As stated earlier, exercising supplemental jurisdiction is within the discretion of the district court and since the district court here properly granted summary judgment to CFAW on the federal law claims, we find that there was no abuse of discretion in dismissing the state law claims. See Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995)(acknowledging that district courts "enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.").

VI.

Based on the foregoing discussion, the judgment of the district court is therefore

AFFIRMED.

---

[9]There is also no basis for original jurisdiction under diversity jurisdiction, 28 U.S.C. § 1332, as both parties are citizens of Virginia.

24

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II, III(C), and IV of the majority opinion, and I agree with the result reached in part III(A). I write separately to explain my differing analysis with regard to the issues addressed in parts III(A), III(B), and V of the majority opinion.

## I.

The Tripps rely on three different legal theories in claiming that the district court erred in granting summary judgment against them on their Truth in Lending Act ("TILA") cause of action, see 15 U.S.C.A. § 1601, et seq. I agree with the majority that the Tripps' claim CFAW did not make known the TILA disclosures were estimates failed as a matter of law. I will address the Tripps' other TILA theories seriatim.

## A.

The Tripps first argue that the district court erred in concluding they had not created a genuine factual issue concerning whether CFAW violated TILA by waiting until after the credit contract was signed to give them a copy of the document containing the TILA disclosures. I agree.

In enacting TILA, Congress declared that "[i]t is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the

25

various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C.A. § 1601(a) (West 1998). TILA specifically authorizes the Federal Reserve Board ("FRB") to adopt regulations to carry out TILA's purposes. <u>See</u> 15 U.S.C.A. § 1604(a) (West 1998).

The transaction at issue in this case was a closed-end credit transaction governed by 15 U.S.C.A. § 1638 (West 1998 & Supp. 2008) and "Regulation Z." <u>See</u> 12 C.F.R. pt. 226, subpt. C (2008). With such transactions, the creditor is required to disclose, <u>inter alia</u>, the amount financed, the finance charge, the annual percentage rate, and the total sale price. <u>See</u> 15 U.S.C.A. § 1638(a); 12 C.F.R. § 226.18. These disclosures must be made before the transaction is consummated. See 15 U.S.C.A. § 1638(b); 12 C.F.R. § 226.17(b). The disclosures also must be made "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1). Official Staff Commentary to the regulation clarifies the meaning of "form that the consumer may keep":

> The disclosure requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and disclosures to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated. It is not sufficient for the creditor merely to <u>show</u> the consumer the document containing the disclosures before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing.

12 C.F.R. pt. 226, Official Staff Commentary 17(b)(3) (emphasis added). This rule that simply _showing_ the disclosures to the consumer rather than allowing him to take possession of them furthers TILA's purpose of allowing consumers "to compare more readily the various credit terms available." 15 U.S.C.A. § 1601. If merely allowing a consumer to view the disclosures were sufficient and allowing the consumer to take possession of the disclosures were not required, consumers seeking to shop different creditors' terms would need to memorize all of the figures as they proceeded from lender to lender.

Here, the Tripps stated in their affidavits and depositions that CFAW merely _showed_ them the relevant documents but never _gave_ them the documents until the documents were signed. According to the Tripps, they did not know CFAW would allow them to take a copy of its documents so that they could compare the terms offered to those offered by another lender. I therefore would hold that the Tripps created a genuine factual issue regarding whether CFAW's disclosures satisfied TILA's requirements.

CFAW argues it forecast evidence that had the Tripps decided to reject the terms disclosed on the credit contract, CFAW would have allowed them to walk away from the deal with a copy of the unsigned credit contract. In support of this claim, CFAW points to the following excerpt from the affidavit of Tim Doe, CFAW's business manager:

27

If a CFAW customer decides to reject the credit terms disclosed on the Credit Contract or on a separate form, even after signing a Buyer's Order, he or she may discontinue and cancel the entire transaction. In this situation, CFAW has no policy against a customer leaving the CFAW dealership with an unexecuted copy of the Credit Contract, which contains the credit terms mandated by [TILA] . . . .

J.A. 391. CFAW's argument notwithstanding, CFAW's internal policy or secret intentions that were never communicated to the Tripps are not sufficient to discharge CFAW's TILA obligations. Until CFAW gave the document to the Tripps, or at least told them they could have it, the Tripps were certainly not "free to take possession of" CFAW's document. The FRB's Staff Commentary clearly provides that merely showing the disclosures to the consumer is not sufficient, and the Tripps forecast evidence that that was all CFAW did in this case.

B.

Despite my belief that the Tripps created a genuine factual issue regarding whether CFAW violated TILA by waiting until after the credit contract was signed to give them a copy of the TILA disclosures, in the end, I, like the majority, conclude that this liability theory fails as a matter of law. The district court concluded that, even if CFAW did not comply with Regulation Z's form and timing requirements, the Tripps' liability theory failed because (1) the Tripps failed to create a fact issue regarding whether they were actually injured from this alleged violation

28

since they had no intention of shopping for better credit terms with other dealers, and (2) statutory damages were not available for the violation of untimely providing the required § 1638 disclosures. The Tripps do not challenge the first conclusion, but they do maintain that proof of a § 1638(b) violation would entitle them to statutory damages, and thus that failure to prove damages is not a basis on which summary judgment may be affirmed. However, for the reasons explained in Baker v. Sunny Chevrolet, Inc., 349 F.3d 862, 865-69 (6th Cir. 2003), I agree with the district court that statutory damages are not allowed for a defendant's untimely presentation of the required TILA disclosures, see also Brown v. Payday Check Advance, Inc., 202 F.3d 987, 990-92 (7th Cir. 2000) (holding that statutory damages are available only for violations of subsections specifically enumerated in § 1640(a)), and I would affirm the grant of summary judgment regarding this theory on this basis.

## II.

The Tripps next argue that the district court erred in determining they had not created a genuine issue of material fact regarding whether the $395 processing fee was required to be included in the "amount financed." I agree.

TILA defines "finance charge," as is relevant here, as "the sum of all charges, payable directly or indirectly by the person to

29

whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C.A. § 1605(a) (West 1998). "The finance charge does not include charges of a type payable in a comparable cash transaction." Id. In order to ensure that the finance charge disclosed to the consumer is the actual cost of obtaining credit, TILA prohibits a creditor from including a finance charge as an element of the "amount financed." See 12 C.F.R. § 226.18 (requiring disclosure and itemization of, inter alia, the finance charge and the amount financed).

I believe that the Tripps created a genuine issue of material fact regarding whether, at the time they purchased their vehicle, CFAW was charging the $395 processing fee to every customer; and for that reason, I believe they also created a genuine issue of material fact regarding whether CFAW should have disclosed the $395 processing fee as part of the finance charge. Doe testified at a deposition in another case in April 1999 that "the services [CFAW provides in exchange] for the processing fee relate only to the title documents," and that the fee is charged on every sale because CFAW needs to ensure that the lien is properly recorded on the title. J.A. 178. Doe explained that his endorsement of a check received from another lender "guarantees lien and title delivered to" that lender. J.A. 179. However, Doe also testified that if the customer paid cash – as opposed to borrowing money from CFAW or

30

another lender – Doe "would give [the customer] the title documents," let them do the title work, and not charge them the processing fee. J.A. 179. At that point in the deposition, CFAW's lawyer requested a break and conferred with Doe. When the deposition continued, Doe testified that he had come to realize, after reviewing documents, that his prior testimony was a mistake and that in fact the processing fee was charged in every case.

In a deposition in the present case taken in May 2001, Doe reiterated that the $395 processing fee is charged regardless of how the customer paid for his car. And, the summary judgment record includes what CFAW contends is paperwork for the sales CFAW made for the months surrounding the Tripp transaction, which CFAW maintains shows that the processing fee was charged to every customer, even when there was no lien to be recorded. Nevertheless, I believe that a reasonable factfinder could credit Doe's initial testimony that if the customer paid cash--as opposed to borrowing money from CFAW or another lender--Doe would not charge them the processing fee, and discredit Doe's contrary testimony as being simply the result of CFAW's counsel's legal advice. Cf. Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000) (explaining that when deponent changes his deposition testimony, it is for the jury to decide which testimony to believe); Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997) (explaining that even when a deponent withdraws his

31

previous deposition testimony, the withdrawn testimony remains part of the record).

If CFAW did not charge the processing fee in sales with no lien, then CFAW did not charge the fee in cash transactions that were comparable to the Tripps' and the fee should have been included as part of the finance charge.  Although CFAW could still maintain that it charged the fee in comparable transactions because it charged the fee to customers who borrow from outside lenders and pay with cashier's checks, those transactions are not comparable to the Tripps', in my view.  In Doe's April 1999 deposition, he testified that CFAW charges the processing fee to buyers paying with cashier's checks from outside lenders because CFAW's endorsement of those checks acts as its guarantee that the lien will be properly recorded.  Because no such guarantee was involved in the Tripps' transaction, it cannot be said as a matter of law that these transactions were comparable to the Tripps'.

Relying on Alston v. Crown Auto, Inc., 224 F.3d 332 (4th Cir. 2000) (per curiam), CFAW argues the transactions that did not involve a lien represented only a small minority of its sales, and it need not charge the fee in every transaction for it to be properly considered part of the amount financed rather than part of the finance charge.  See Alston, 224 F.3d at 334 (holding that processing fee was not finance charge when general practice was to charge the fee regardless of whether customer paid with cash or

32

credit).  But, <u>Alston</u> is distinguishable from the present case in that the critical fact in <u>Alston</u> was that the seller's general policy was to charge the fee to everyone; the two cash customers who did not pay the fee had individually negotiated for that arrangement.  <u>See</u> <u>id</u>.  If CFAW's policy was not to charge the fee in no-lien sales, however, then the fee was not generally charged in comparable cash transactions, and it should have been included as part of the finance charge.  I therefore would reverse the district court's grant of summary judgment against the Tripps on this claim.

## III.

The district court, having granted summary judgment on all of the Tripps' federal claims, declined to exercise supplemental jurisdiction over their state claims.  <u>See</u> 28 U.S.C.A. § 1367(c)(3) (West 2006).  Because I would reverse the grant of summary judgment on the TILA claim, I would also reverse the district court's refusal to exercise supplemental jurisdiction on the state law claims.  <u>See</u> <u>Gruenke v. Seip</u>, 225 F.3d 290, 308 (3d Cir. 2000).

## IV.

In sum, I would reverse the district court's grant of summary judgment on the TILA claim that the $395 processing fee was required to be included in the "amount financed," vacate the

district court's dismissal of the state law claims, and remand the TILA and state law claims to the district court for further proceedings. For the reasons expressed in Part I of my opinion and Parts III(C) and IV of the majority opinion, I would otherwise affirm the district court's order granting summary judgment against the Tripps.